# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

HENRY KEELER REDLIGHTNING,
            *Defendant-Appellant.*

No. 09-30122

D.C. No.
2:07-cr-00358-
JLR-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
May 4, 2010—Seattle, Washington

Filed October 25, 2010

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge Gould

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

17507

## COUNSEL

Michael Filipovic (argued), First Assistant Public Defender, Corey Endo, and Christopher J. Kerkering, Seattle, Washington, for the defendant-appellant.

Jenny A. Durkan, U.S. Attorney, Michael S. Morgan (argued), Assistant U.S. Attorney, Western District of Washington, Seattle, Washington, for the plaintiff-appellee.

## OPINION

GOULD, Circuit Judge:

Henry Redlightning appeals his jury conviction for killing Rita Disanjh on Native American land with premeditation and in the perpetration or attempted perpetration of sexual abuse. *See* 18 U.S.C. §§ 1111, 1151, 1153(a). Redlightning argues first that the district court erred by refusing to suppress his confessions to the murder of Disanjh. Redlightning's theories of suppression are that the confessions resulted from his unlawful detention by FBI agents and also that the agents did not promptly present him for an arraignment. Redlightning argues second that the district court erred by excluding expert testimony about false confessions and expert testimony about the effect of Redlightning's impaired vision, diabetes, and Post-Traumatic Stress Disorder ("PTSD") on his mental condition and susceptibility to making a false confession.

Redlightning argues third that the district court erred on several other evidentiary rulings, such as by excluding evidence that a police officer previously supplied a suspect with non-public information about the murder, by excluding hearsay evidence that another suspect may have committed the murder, and by excluding evidence of manual strangulations in neighboring King County. Redlightning argues fourth that the district court erred by admitting into evidence his confessions to sexually assaulting another victim. Redlightning argues fifth that the district court erred by rejecting his proposed jury instruction about the reliability, credibility, and truthfulness of his confession. Redlightning argues sixth that the prosecutor engaged in misconduct, offending due process, when he said during closing arguments that people do not confess to crimes they did not commit. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

# I

On August 9, 1987, the body of Rita Disanjh was found in the Nooksack River on the Lummi Indian Reservation in Whatcom County, Washington. There was no forensic evidence that Disanjh was sexually assaulted, but that could be inferred because her body was discovered unclothed, the body was found in water and that could have washed away evidence of a sexual assault, and the pathologist could not rule out the possibility of a sexual assault. A pair of women's underwear was found in the water near the body. The pathologist concluded that Disanjh was killed by manual strangulation, and thought this distinctive because it was the only manual strangulation that the pathologist could remember in thirty-six years as Whatcom County's pathologist. Disanjh did not have drugs in her system, but had a blood-alcohol level of 0.22. The police found tire tracks near the body.

The police learned that on the night of her murder Disanjh had been with her boyfriend, John Root, but left him to visit a Bellingham bar. From there, Cyril LaClair gave Disanjh a

ride to a beach party on the Lummi reservation. Initial suspects in Disanjh's murder included Root and Gregory Pepin, Disanjh's ex-boyfriend who had previously assaulted Disanjh and who had violated a protection order. The police later ruled out Pepin as a suspect. The police spoke to about forty people in the weeks after the murder but developed no leads.

On January 30, 2006, more than eighteen years after the murder, Athena Swope contacted the Whatcom County Sheriff's Office. Swope is the daughter of Redlightning's partner, Patricia Dubbs, and Swope had been living with and caring for Redlightning. There was evidence that Swope had an axe to grind. Swope and Redlightning had been having disputes over money. Athena Swope told the police that Redlightning had verbally abused her and her family and asked if there was a statute of limitations on abuse. She also told of abuse Redlightning inflicted on his grandchildren. The police responded that they could not help her with these issues and referred her to Child Protective Services. Athena Swope then told the police that Redlightning and a former boyfriend Kevin Swope[1] were involved in the murder of a woman.

Agent James Powers of the FBI thereafter interviewed Athena Swope, who in 1987 had been fifteen years old. She told Powers that the night before the Disanjh murder Redlightning and Kevin Swope left in Redlighting's car—a red Plymouth Barracuda—for a night of drinking. She said that the next morning the car and Redlightning's clothes were covered in brown, clay mud. She also said that Redlightning and Dubbs on that morning had an argument, and thirty minutes later began washing the car. Athena Swope said that Redlightning then told her he was going to sell the car, and soon thereafter he did sell it. Athena Swope also told Powers

---

[1]At the time of making this police report, Athena Swope was married to John Swope but at one time she had dated his brother, Kevin Swope, hence Athena Swope has the same last name as her former boyfriend Kevin Swope.

that her mother told her, before Dubbs died in 2003, that Redlightning had confessed to Dubbs that he was involved in the Disanjh murder.

Agent Powers thereafter began to investigate Redlightning, a Vietnam War veteran who was thirty-seven-years-old when Disanjh was murdered. Redlightning has several medical problems and limitations. He suffers from PTSD and the military determined that because of his condition he is 70 percent disabled. Conversations about Vietnam affect Redlightning's ability to process information, causing him to become disorganized and confused. Redlightning suffers from diabetes, has a low-average intellect, is blind in his left eye, and has limited peripheral vision in his right eye.

During his investigation, Agent Powers also learned that Redlightning had confessed to and was convicted of sexually assaulting Linda Rosario in 1990 after Rosario asked Redlightning about his experience in Vietnam. Agent Powers obtained a DNA sample from Redlightning and Redlightning's Veterans Administration file with medical records that showed Redlightning suffered from diabetes and PTSD. Agent Powers thereafter contacted Agent Raymond Lauer, an FBI polygraph and interrogation expert, to help him in questioning Redlightning.

On October 2, 2007, Agents Powers and Lauer cleared Agent Powers's office preparing for a planned interview with Redlightning. They later went to Redlightning's home and asked him if he would come to the FBI office in Bellingham to talk about some cases. Redlightning agreed, and went with them to the FBI office. During the questioning, Redlightning at first denied involvement in the Disanjh murder and denied knowing Disanjh upon being shown her photograph. Redlightning agreed to answer questions in a polygraph examination, and, upon only the fifth question in the polygraph examination, Redlightning confessed to sexually assaulting and killing Disanjh. Agent Lauer removed the

polygraph equipment after Redlightning's admission of guilt and Lauer continued questioning Redlightning about the murder. During this questioning, Redlightning denied committing five other local unsolved murders but also said he participated in or observed the rape or murder of thirty to forty civilians in Vietnam. Although Redlightning had just given a simple "yes" answer initially in the polygraph examination when asked if he sexually assaulted and killed Disanjh, following the further examination by the agent, Redlightning signed a confession giving details about the murder.

After the questioning ended, the FBI agents drove to Redlightning's home to retrieve his medicine, and then they booked Redlightning into the Whatcom County jail.

The next day Agent Powers drove Redlightning from Bellingham to Seattle for Redlightning's arraignment. While transporting Redlightning to Seattle, Agent Powers spoke with an Assistant U.S. Attorney who asked if Agent Powers would reinterview Redlightning. Detouring off the interstate highway that connects Bellingham to Seattle, and which passes through Everett, Agent Powers drove to the FBI office in Everett, Washington, and there obtained an additional confession from Redlightning. Agent Powers thereafter promptly resumed the trip and delivered Redlightning to the district court before the scheduled 2:30 p.m. arraignment.

Subsequently, Agent Powers discovered that the automobile Redlightning used in 1987 had standard wheel width and tracks that were "very close" to the tire tracks found near Disanjh's body. That evidence, however, was not entirely conclusive because he also learned that 809 different types of cars and trucks would have had wheel tracks within an inch and 496 would have been within a half of an inch of those measurements.

Before trial, Redlightning sought, among other things, to have his confessions to murdering Disanjh suppressed and to

allow an expert witness to testify about the phenomenon of false confessions. However, Redlightning never recanted his confession by communication to the FBI. The district court denied Redlightning's motions.

At trial, Redlightning sought to establish that the confessions were not credible, trustworthy, or reliable. An ophthalmologist testified regarding Redlightning's vision problems, a doctor testified about Redlightning's diabetes, and a neuropsychologist testified about Redlightning's PTSD. Redlightning tried to establish that death by manual strangulation was not as uncommon as the Whatcom County pathologist had suggested. Redlightning sought to show that Disanjh's ex-boyfriend was a viable suspect with a history of violence against Disanjh. Redlightning attempted to undermine Swope's credibility by pointing out errors in her statement and a motive for lying.

The government marshaled its evidence and arguments tending to show that Redlightning did in fact murder Disanjh, while suggesting that it was "exceedingly unlikely" that Redlightning committed the multiple and massive number of Vietnam War crimes for which he had asserted responsibility during the first confession interview with Agent Lauer. As for evidence, beyond his own confessions, incriminating Redlightning in Disanjh's murder, the area where Disanjh's body was discovered was muddy and contained tire tracks, and there was testimony that on the night of the murder Redlightning and Kevin Swope went out with Redlightning's car. Also, more than one witness testified that the next morning Redlightning and his partner, Patricia Dubbs, were seen cleaning mud off his car. More than one witness testified that Redlightning changed his car's tires. Nancy Budde, an acquaintance of Redlightning, testified that Redlightning nodded his head "yes" when she asked him if he killed a woman on the Lummi Reservation. The sexual assault of Linda Rosario was also admitted into evidence; she, like Disanjh, had been strangled. The jury found that Disanjh was murdered in

connection with Redlightning's perpetration or attempt to perpetrate a sexual assault. The government emphasized the detail given by Redlightning in his signed confession. For example, he accurately said that the body was dumped in the Nooksack River and that the victim was strangled. He also said that Disanjh had angered him by taking his photograph at the Holly Tavern. Although Redlightning's counsel disputed that Disanjh had taken photographs of Redlightning, Disanjh was an amateur photographer and her former boyfriend and son testified that she had her camera the night of her murder.

The jury found Redlightning guilty of killing Disanjh with premeditation and in the perpetration of, or the attempt to perpetrate, aggravated sexual abuse or sexual abuse. The district court sentenced Redlightning to life in prison and entered judgment on March 23, 2009. Redlightning timely appeals.

## II

We first address Redlightning's argument that he was arrested without probable cause before he confessed and therefore the resulting confessions, one given on October 2, 2007, and the second on October 3, 2007, should be suppressed as the fruit of the poisonous tree. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Because we conclude that Redlightning did not confess as the result of an unlawful arrest, the district court did not err in refusing to suppress the confessions.

On this part of the appeal, the questions at the core are whether Redlightning was under arrest before he confessed that he had murdered Disanjh and, if so, whether there was probable cause to arrest. With regard to the October 3 confession, there was clearly cause to detain and arrest Redlightning once he had made his prior October 2 confession to killing Disanjh, but if the October 2 confession was given in violation of the Constitution, then both it and the later confession

on October 3 could be excluded as a fruit of the initial illegality.

**A**

We must decide whether Redlightning was under arrest when he visited the Bellingham FBI office on October 2 and made his first confession to the FBI.

On October 2, 2007, Agents Powers and Lauer prepared Powers's office for an anticipated interview with Redlightning. According to Agent Powers, because the FBI's Bellingham office did not have an interview room, Agent Powers "sanitized" his office by, for example, taking the pictures off the walls and emptying his desk. Then Agents Powers and Lauer went to Redlightning's home. The agents knocked on Redlightning's door and identified themselves. The agents were armed, but their firearms were concealed under their jackets, and at least Agent Powers did not have handcuffs with him. They asked Redlightning if they could "talk to him for a couple minutes." With Redlightning's permission, the agents entered his home. The agents told Redlightning that they were "investigating some cases" and asked if Redlightning "would be willing to come down to the office." Redlightning agreed.

Before leaving the house, the agents asked Redlightning if he needed a jacket, which he put on. The agents also asked Redlightning if he needed anything to eat or needed to bring any medication with him. Redlightning replied that he did not need any medication until later that evening, implying that he intended to return home that night. Redlightning was not wearing his eyeglasses, but Agent Powers testified that Redlightning did not have trouble getting around the house. Upon heading to the car, Agent Powers performed a quick pat down with the backs of his hands, checking Redlightning's ankle and waistband areas. The agents did not tell Redlightning that he had the right to refuse to accompany them to the

FBI office, but neither did they tell him that he had to go. The agents used no tools of coercion to force Redlightning to go with them; they asked him if he would come in to talk because they were investigating cases, and he agreed to do so. A request by law enforcement and responsive cooperation by an individual are routine and, alone, do not amount to an arrest.

Agent Powers testified that upon arrival at the FBI office, Redlightning did not have any difficulty getting from the car to the elevator. Agent Powers also testified that at the elevator Redlightning put his hand on the wall. When asked if he was "feeling okay," Redlightning replied, "You know, I'm feeling fine, I just have a little trouble seeing." Agent Powers testified that Redlightning moved on his own.

Inside Agent Powers's office, Redlightning sat across from the desk and Agent Lauer sat where Agent Powers would normally sit at his desk. Agent Lauer told Redlightning that he "wanted to talk to him about some old investigations." Agent Lauer offered Redlightning water, which Redlightning declined. Agent Lauer read Redlightning his *Miranda* rights. Redlightning waived his rights by signing a waiver form. Agent Powers left the room.

Agent Lauer described Redlightning as "pleasant," "calm," and "very coherent." Agent Lauer told Redlightning that he was investigating a homicide and asked Redlightning about war crimes Redlightning reportedly witnessed in Vietnam. Redlightning informed Agent Lauer that he suffers from PTSD. Redlightning talked about his 1990 conviction for assaulting and raping Linda Rosario. Redlightning said that he took a polygraph examination during the Rosario investigation. Agent Lauer asked whether Redlightning had choked and sexually assaulted anyone else. Agent Lauer then again asked Redlightning about war crimes. Lauer told Redlightning that he was investigating the death of Rita Disanjh and asked Redlightning whether he was involved or knew anything

about the Disanjh murder, to which Redlightning answered in the negative. Agent Lauer showed Redlightning a photograph of Disanjh. Redlightning said that he did not recognize her.

Agent Lauer then asked Redlightning if he would agree to take a polygraph examination, and Redlightning agreed. The fifth question asked in that examination was, "Did you sexually assault and kill Rita?" Redlightning responded, "Yes." Agent Lauer turned off the polygraph machine, removed the components, and continued the questioning. Redlightning then dictated a statement to Agent Lauer detailing his involvement in Disanjh's sexual assault and murder, and Redlightning signed the statement. This confession stated:

> I, Henry Keeler, also sometimes known as Henry Keeler Red Lightening [*sic*], freely and voluntarily make the following statement to Ray Lauer and Jim Powers, two people I know to be Special Agents with the Federal Bureau of Investigation. I dropped out of high school in the 10th grade. I worked on my GED while in prison but I couldn't pass the math portion. I am blind in my left eye and almost blind in my right eye. Because of that Ray Lauer read me my rights. I understand what they are and I'm talking voluntarily to them. I have post traumatic stress syndrome but I'm otherwise mentally fit. I don't use illegal drugs and I'm not under the influence of alcohol.

> In August either on the 8th or 9th in 1987 I was drinking at an Indian bar called the Holly on Holly street in Bellingham, WA. Rita Disanjh came into the bar and started taking pictures. I didn't like it, I don't like having my picture taken, but regardless, I didn't say anything to her.

> Later everyone went to a beach party at the Lummi Reservation. As I was getting ready to leave,

Rita Disanjh asked for a ride back to Bellingham with me. I think she lived in the Fairhaven area. As we were leaving the party she started asking me about Vietnam. I don't like talking about Vietnam when I'm drinking. I kept asking her to stop but she kept asking questions. I finally pulled the car over. At the time I was driving a 1967 Barracuda. I pulled into the parking lot of a business called Solomon's Fish house. There I raped and strangled Rita Disanjh. I then put her body into the Nooksack River and drove home. Kevin Swope was passed out in the back of my car. He didn't participate in Rita's murder. I never told him what I did. Swope is dead now.

Ray Lauer read this statement to me. I agree with it and in fact asked Special Agent Lauer to add the part of Swope being dead. I am voluntarily signing it because it is true and correct.

## B

**[1]** "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint." *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (internal quotation marks omitted). Redlightning contends that even if his initial encounter with the FBI was voluntary, the agents' subsequent conduct transformed the encounter into an in-custody detention that was not supported by probable cause before Redlightning confessed. Accordingly, Redlightning argues, any subsequent voluntary statements must be suppressed.

**[2]** "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would

have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009)

> The ultimate inquiry underlying the question of custody is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. To answer this question, the reviewing court looks to the totality of the circumstances that might affect how a reasonable person in that position would perceive his or her freedom to leave.

*Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010) (internal quotation marks and citations omitted). The "reasonable person" test is an objective test, *California v. Hodari D.*, 499 U.S. 621, 628 (1991), applied from the viewpoint of an innocent person, *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009), and considering the readily apparent personal characteristics of the accused, *see, e.g.*, *Mendenhall*, 446 U.S. at 558; *United States v. Moreno*, 742 F.2d 532, 536 (9th Cir. 1984) (holding that a factor in determining whether the defendant was seized was that the defendant was a Colombian citizen with limited English skills).

**[3]** The totality of the circumstances determines whether a person was arrested. *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001). Factors relevant to whether an accused is in custody include "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.*; *see also Mendenhall*, 446 U.S. at 554 (holding that factors include threatening presence of several officers, display of a weapon, physical touching, and use of language or tone of voice indicating that compliance might be compelled). When an

encounter is consensual, it is "outside the ambit of the Fourth Amendment's guarantee against unreasonable searches and seizures." *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994). The absence of explicitly informing the person that he or she is free to leave is not a dispositive factor. *United States v. Orman*, 486 F.3d 1170, 1176 (9th Cir. 2007).

We conclude that the totality of circumstances and the balance of factors weigh in favor of the government and that Redlightning was not in custody during the October 2 questioning until he confessed to the Disanjh sexual assault and murder. The encounter at Redlightning's home did not amount to a seizure. Redlightning voluntarily agreed to join the FBI agents at the FBI office. He was not handcuffed. No guns were brandished by the agents. One of them did not have handcuffs, which tends to indicate the absence of an intent to arrest. The minimal pat-down search to which Redlightning was subjected, before he got in the FBI car, was routine before entering an FBI vehicle. Redlightning's response to agents about medication indicated that in the circumstances then presented he believed he would be returning home that evening.

However, while the encounter at Redlightning's house and his agreement to depart with the agents to aid their investigative questioning was consensual, we must consider whether these circumstances gradually escalated into a setting where a reasonable person standing in his shoes would not have felt free to leave, yet before agents gained probable cause to arrest. Stated another way, we need to consider whether the cumulative circumstances escalated to the point where Redlightning was effectively in custody. For example, the United States Supreme Court concluded that an arrest had occurred when events escalated into an investigatory procedure in a police interrogation room. *Florida v. Royer*, 460 U.S. 491, 503 (1983); *see also Washington*, 490 F.3d at 772-73 (events after a *Terry* stop escalated to a point where a reasonable person would not have felt free to leave, assess-

ing such features as lateness of night on a dark city street and more than one police car arriving at the scene and blocking passage); *Moreno*, 742 F.2d at 535 (describing how the defendant found himself "in a highly detentive environment—in a small room that had been specifically designated for police business").

**[4]** Yet, before Redlightning confessed to the murder early in the polygraph examination, there was no evidence that would show a reasonable person standing in his shoes would not have felt that discussion was voluntary. Having voluntarily accompanied the FBI, Redlightning could have indicated a desire to leave before he confessed. There is no showing that the door to the room in which Redlightning was questioned was locked and that door in any event could be unlocked from the inside. The room was not being used to detain Redlightning but to interview him. The agents testified at the suppression hearing that Redlightning could have terminated the encounter at any time. Only one agent remained in the room during the questioning. The questioning was brief up to the point of Redlightning's confession. Until then no evidence suggests that a reasonable person in the circumstances would not have felt that he could terminate discussion and depart. The evidence, instead, shows that a reasonable innocent person would have felt free to leave.

Denying the motion to suppress, the district court first correctly stated that "the Supreme Court has held that a defendant is under arrest using a standard that asks whether a reasonable person would have believed that he was not free to leave." The district court next correctly applied this familiar standard:

> The record, as it's been developed in this hearing, I believe, establishes the following. The defendant was requested to accompany FBI agents Powers and Lauer to the FBI office in Bellingham on the morning of October 2nd. There is no disagreement in the

record that he voluntarily agreed to accompany the agents when asked to do so. I find that he was not under arrest at the time that he accompanied the FBI agents to the office in Bellingham that morning, and that he was free to leave or to stop the interrogation until affirmatively responding to the question of did you sexual assault and kill Rita DiSanjh. By my notes, that occurs at about 12:22 pm.

We agree with the district court that nothing that occurred before the point when Redlightning confessed to murdering Disanjh, very early in his polygraph examination, transformed the interview session into an "in custody" setting.

Redlightning focuses on the moment when Agent Lauer asked if Redlightning would submit to a polygraph examination and when Agent Lauer hooked Redlightning to the polygraph equipment as likely points at which the encounter was no longer consensual. We disagree that these were transforming events, either individually or cumulatively. Agent Lauer asked Redlightning if he would be willing to take the polygraph examination. Agent Lauer did not require Redlightning to take it. His choice to submit to the polygraph examination was voluntary. There is no evidence that Redlightning submitted to the examination because he felt restrained. We rest our decision on the totality of circumstances, on all that was said and done by the agents and Redlightning, and the context in which this occurred, from the time the agents knocked on Redlightning's door until the time he confessed to murdering Disanjh, at the Bellingham FBI headquarters in Agent Powers's office during his polygraph examination.[2]

---

[2]Our decision, rejecting Redlightning's argument stressing the use of polygraph, is reinforced by the fact that we have held that the "threat of a polygraph would be more relevant to whether [the defendant's] confession was voluntary, rather than whether he was in custody." *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005). Here there is no suggestion that Redlightning's October 2 confession was involuntary, and we note it was given very early in his interview session and after he had received a *Miranda* warning.

Although the FBI did not explicitly tell Redlightning that he was free to leave at any time,[3] the totality of the circumstances shows that objectively Redlightning was cooperating as a volunteer. Before his confession he was able to terminate the interview and depart. Moreover, the FBI agents did not present Redlightning with any evidence showing that he committed the crime. Agent Lauer asked Redlightning about his prior rape conviction and his conduct in the Vietnam War, but those questions did not necessarily tie Redlightning to the Disanjh murder. When shown Disanjh's picture, Redlightning said that he did not know her. There is no suggestion that the brief series of polygraph questions asked before Redlightning's confession were themselves coercive or contained any implied promises. Nothing prevented Redlightning from ending the questioning, calling a taxi to take him home, walking the short distance home, or asking the FBI agents to return him to his home. The totality of the circumstances, including Redlightning's voluntary cooperation throughout and his unrestricted path to the door, show that a reasonable person would have felt free to leave.

The reading of *Miranda* rights prior to questioning in the FBI interview room could equally support the position of either party, and in some circumstances might indicate a person was not free to leave, *see United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) (explaining that when the police officer read defendant his *Miranda* rights the defendant stopped the officer and said, "Oh, I'm under arrest?"). The controlling legal standard requires, however, that we consider the total circumstances and how an objective

---

[3]Our conclusion that there was no unreasonable seizure "is not affected by the fact that the respondent was not expressly told by the agents that [he] was free to decline to cooperate with their inquiry, for the voluntariness of [his] response does not depend upon [his] having been so informed." *Mendenhall*, 446 U.S. at 555. This suggested analysis has been followed in our Circuit. *See*, *e.g.*, *Orman*, 486 F.3d 1170 at 1176 ("[T]he consensual nature of the encounter is not undermined by [the police officer's] failure to expressly tell [the suspect] that he was free to leave.").

person would assess if he was free to leave. We conclude, as stated by a leading commentator, that "the issuance of *Miranda* warnings as a cautionary measure does not itself transform the situation into a Fourth Amendment seizure." 3 Wayne R. LaFave, *Search and Seizure* § 5.1(a) (4th ed. 2004).

**[5]** The agents did not use heavy-handed tactics to confuse, disorientate, or intimidate Redlightning, and the overall pressure applied did not rise to a level where a reasonable person would have felt prohibited from leaving. By contrast there may be coercive settings and tactics that inescapably would lead an objective person to think that the person could not leave. *See, e.g., United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) ("Accusing Beraun-Panez repeatedly of lying, confronting him with false or misleading witness statements, employing good guy/bad guy tactics, taking advantage of Beraun-Panez's insecurities about his alien status, keeping him separated from his co-worker in a remote rural location, insisting on the 'truth' until he told them what they sought, the officers established a setting from which a reasonable person would believe that he or she was not free to leave.").

**[6]** Given the totality of circumstances, we conclude that in the time leading to Redlightning's confession, a reasonable person in Redlightning's shoes would have thought that he or she could get up and go if declining to take part in further investigative questioning. We hold that Redlightning's initial confession on October 2 was not the result of an unlawful seizure. It follows inescapably that his second confession on October 3 was not a fruit of a prior unconstitutional act. Therefore, the district court correctly refused to suppress his October 2 confession, rejecting the argument that he was in custody without probable cause, and concluded that the October 3 confession was not a fruit of a prior unconstitutional act.

## III

Redlightning challenges the district court's denial of his motion to suppress his October 3 confession, contending that the FBI failed to "take the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a).**⁴**

**[7]** Before the enactment of Rule 5(a), "the obligation of an officer to present an arrestee before a magistrate judge without unreasonable delay was a common law right," and federal courts would "enforce this prompt-presentment requirement by suppressing a defendant's confession if it was made after an unreasonable delay in bringing him before a judge." *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1104 (9th Cir. 2009) (internal quotation marks omitted). The purpose of the rule was to "check[ ] resort to those reprehensible practices known as the 'third degree.' " *Id.* (citing *McNabb v. United States*, 318 U.S. 332, 344 (1943)); *see also* Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, *Criminal Procedure* § 6.3(b) (5th ed. 2009). Applying the newly enacted Rule 5(a), the Supreme Court held that a confession made about seven hours after arrest was inadmissible due to unnecessary delay. *Mallory v. United States*, 354 U.S. 449, 455 (1957). "Thus, the rule known simply as *McNabb-Mallory* generally renders inadmissible confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a)." *Corley v. United States*, 129 S. Ct. 1558, 1563 (2009) (punctuation omitted). The standard under the *McNabb-Mallory* rule requires, subject to the statutory safe harbor described below, that there be no unreasonable delay in presenting a person accused of crime before a neutral magistrate after his or her arrest. *See generally* LaFave, et al., *Criminal Procedure*, *supra* § 6.3.

---

**⁴**Redlightning does not challenge the admissibility of his October 2 confession under the prompt presentment requirement.

**[8]** Congress thereafter enacted 18 U.S.C. § 3501(c), which "provides that a court may not suppress a confession made during a six-hour safe-harbor period solely due to delay in presentment if the confession was made voluntarily and if the weight to be given the confession is left to the jury." *Garcia-Hernandez*, 569 F.3d at 1104.

> The statute also provides for an extension of the six-hour time limit in any case in which the delay in bringing such person before such magistrate judge . . . is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge . . . .

*Id.* at 1104-05 (internal quotation marks omitted). The Supreme Court recently held that "§ 3501(c) did not supplant the *McNabb-Mallory* rule, but rather modified the rule to 'provide immunization to voluntary confessions given within six hours of a suspect's arrest.'" *Id.* at 1105 (quoting *Corley*, 129 S. Ct. at 1564). Accordingly, the Supreme Court set forth a two-part test for assessing potential violations of the prompt-presentment requirement:

> [A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate"). [1] If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and the weight to be given it is left to the jury." [2] If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.

*Id.* (quoting *Corley*, 129 S. Ct. at 1571).

Redlightning's argument that there was not a reasonably prompt presentment relies on the factual assertion that the FBI should have taken Redlightning to the nearest magistrate judge in Seattle, Washington, on October 2 by 2:30 p.m., which was the daily calendared and scheduled arraignment time for federal defendants in Seattle.[5] However, that premise is neither realistic nor reasonable, and we decline to impose it upon the government. The initial interview with Redlightning occurred in Bellingham, Washington, about 90 miles from Seattle, and, given traffic and speed limits, at least a ninety-minute drive away. At 12:22 p.m. on October 2, Redlightning first implicated himself in the Disanjh murder. The FBI was not required immediately to stop questioning and start driving Redlightning to a Seattle arraignment. The FBI, after hearing Redlightning's initial confession, was entitled reasonably to continue questioning him sufficiently to assess what he had said. In fact, the FBI questioned Redlightning about the Disanjh murder until 1:45 p.m. This duration of less than one and a half hours after his first confession is not unreasonable, and at that point he could not have been taken to Seattle in time for a 2:30 p.m. arraignment. Thereafter, until 5:30 p.m., the FBI questioned Redlightning about incidents unrelated to the Disanjh murder. That period of questioning was also reasonable and within the statutory safe harbor for interrogation time. At 5:30 p.m. the FBI took Redlightning to his home to retrieve his medication and then to the Whatcom County Jail for an overnight stay. It was reasonable to get Redlightning his needed medication, and the overnight jail stay could not reasonably be avoided. At 8:30 a.m. on October 3, the FBI agents began driving Redlightning from the Whatcom County Jail to the Seattle courthouse for

---

[5]A part-time magistrate judge was available in Bellingham on October 2, but the district court found that the magistrate judge was not equipped to conduct Redlightning's arraignment. Redlightning does not challenge that conclusion on appeal.

his arraignment. During the drive, Agent Powers received a call from Assistant U.S. Attorney Michael Lang, who asked Agent Powers if he would reinterview Redlightning in order to elicit Redlightning's motivation for the killing and "finish the interview" from the day before. In response, the FBI agents detoured to the Everett FBI office to interrogate Redlightning, which lasted about fifteen minutes and resulted in another confession. The FBI agents resumed the trip, and Redlightning arrived at the Seattle courthouse at 10:50 a.m. Redlightning met with an attorney several hours before appearing in front of the magistrate judge at 2:30 p.m.

[9] The district court concluded that Redlightning was effectively arrested at 12:22 p.m. on October 2 because that was the moment he first confessed to the Disanjh murder. If the FBI agents had stopped questioning Redlightning then, immediately upon his confession, they perhaps could have reached Seattle in time for the 2:30 p.m. arraignment. However, because the agents were entitled to at least a six-hour safe harbor to continue questioning Redlightning, the FBI was under no obligation to stop the questioning immediately the moment Redlightning confessed, nor would it have been reasonable for them to do so. Because the interview ended at 5:30 p.m. on October 2, which was well within the six-hour safe harbor, the FBI agents could not have transported Redlightning to the Seattle courthouse in time for the October 2 arraignment calendar. We hold that the agents did not violate the prompt-presentment requirement by not delivering Redlightning to Seattle on October 2.

Redlightning further contends that because the FBI stopped questioning him about the Disanjh murder at 1:45 p.m., the FBI could have driven him to Seattle by 4:30 p.m., the time that Redlightning argues is the latest a magistrate judge in Seattle will process an arraignment after the 2:30 p.m. calendar has begun. Although it is possible that the FBI may have

been able to make such arrangements, it was reasonable not to attempt such a feat, and the FBI was not required to do so.[6]

**[10]** The next reasonably available time to arraign Redlightning was therefore at 2:30 p.m. on October 3. Under the first step in *Corley*, the six-hour safe harbor may be extended if the delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate." 129 S. Ct. at 1564. Because the government reasonably intended to transport Redlightning via automobile to a magistrate judge presiding about 90 miles away, and therefore could not have delivered Redlightning by the 2:30 p.m. arraignment scheduled on October 2, the delay until 2:30 p.m. on October 3 was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate. Redlightning's subsequent confession made en route to the October 3 arraignment, although made beyond the six hour safe harbor after Redlightning's arrest on October 2, was made before arraignment scheduled at a reasonable time under the circumstances. For that reason, Redlightning's October 3 confession at the Everett FBI office did not run afoul of the prompt-presentment requirement.

The initial appearance for arraignment on October 3, although beyond six hours from the time Redlightning confessed to killing Disanjh and considered then in custody, was

---

[6]Redlightning concedes that the trip to Seattle could have taken as long as two hours, and with the time needed to get Redlightning prepared for the trip, it seems, at best, that the agents may have delivered Redlightning by 4:00 p.m. Yet because a 4:00 p.m. arrival would have been ninety minutes after the 2:30 p.m. arraignment calendar regularly began, the agents would have been forced to make special arrangements to process Redlightning's arraignment at the later time. Rule 5(a) does not require that law-enforcement officers go to such lengths, and the possibility of successfully processing Redlightning by 4:30 p.m. is speculative. Moreover, the government was within its authority to continue questioning Redlightning and to use any voluntary, inculpatory statement made within the six-hour safe harbor after the arrest, ending at 6:22 p.m., well after the arraignment calendar had ended.

not improperly delayed. *See id.* at 1571 ("If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases . . . ."). The six-hour safe harbor ended at 6:22 p.m. on October 2, at which point Redlightning had already been taken home to retrieve his medication. *See United States v. Manuel*, 706 F.2d 908, 914 (9th Cir. 1983) (holding that delay for "humanitarian motives can hardly be deemed unreasonable per se"). The overnight delay occurred because no magistrate judge was available. *See United States v. Van Poyck*, 77 F.3d 285, 289 (9th Cir. 1996) ("An overnight or weekend delay in arraignment due to the unavailability of a magistrate does not by itself render the delay unreasonable under § 3501(c)."). Similarly, no magistrate judge was reasonably available until 2:30 p.m. on October 3, when the next arraignment calendar commenced, so the delay until 2:30 p.m. on October 3 was reasonable. *Cf. United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1988) ("Even assuming that the delay overnight was reasonable, there is no reasonable excuse why Wilson was not promptly arraigned *at the beginning of the arraignment calendar the next day*." (internal footnote omitted, emphasis added)). Provided that the government delivered Redlightning by 2:30 p.m. on October 3, any voluntary confession made by that time need not be suppressed. *See Garcia-Hernandez*, 569 F.3d at 1106 ("In particular, we have held that administrative delays due to the unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt-presentment requirement of Rule 5(a).").[7]

---

[7]Redlightning's reliance on *United States v. Wilson*, is misplaced. *Wilson* is inapposite because the police in that case intentionally delayed beyond the earliest reasonably available arraignment in order to interrogate the defendant further. 838 F.2d at 1083-85. Here, Redlightning was presented before a magistrate judge at the earliest reasonable time for an arraignment; there was no unreasonable or unnecessary delay.

**[11]** The district court described as "seemingly a danger-
ous move" the diversion to engage in further interrogation on
October 3. Possibly that would be so if the further interroga-
tion in Everett resulted in delivering Redlightning to the mag-
istrate judge after 2:30 p.m. and thus delayed arraignment.
The presentment then would not have been reasonably
prompt, and that would put admissibility of the October 3
confession, at the FBI Everett office, in question. But
Redlightning was delivered well before the scheduled October
3, 2:30 p.m. arraignment, and Redlightning had ample oppor-
tunity before his arraignment to speak with an attorney.
Because the government's conduct did not result in an unrea-
sonable delay of the arraignment, there was no violation of
the prompt presentment requirement, and the district court did
not err in refusing to suppress the October 3 confession.

## IV

Redlightning next argues that the district court erred in
excluding the expert testimony of Dr. Richard Leo and
excluding in part that of Dr. Alan Breen. Dr. Leo would have
testified on topics including the phenomenon of false confes-
sions generally; how and why psychological interrogation
methods can, and sometimes do, cause innocent suspects to
make false confessions; the interrogation methods taught by
Agent Lauer and how those techniques could lead to a false
confession; and which police techniques create a higher risk
of eliciting false confessions. He argues that Dr. Breen, a
neuropsychologist who evaluated Redlightning, should have
been allowed to testify to "assist the jury in understanding Mr.
Redlightning's biological, physical and mental state during
the course of the interrogation sessions." Redlightning con-
tends that exclusion of Dr. Leo's testimony in whole and Dr.
Breen's testimony in part was reversible error.

## A

We review for abuse of discretion a district court's decision
to exclude expert testimony. *United States v. W.R. Grace*, 504

F.3d 745, 759 (9th Cir. 2007). In the context of a denial of motion for a new trial, we recently held that determining whether a district court abused its discretion involves a two-step inquiry. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). First, we determine de novo whether the district court identified the correct legal rule to apply to the relief requested. *Id.* at 1261-62. If the district court did not identify the correct legal rule, it is an abuse of discretion. *Id.* at 1262. Second, we determine if the district court's application of the correct legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Id.*

The *Hinkson* test for abuse of discretion has been applied in varied contexts. *See, e.g.*, *Taylor v. Thacker* (*In re Taylor)*, 599 F.3d 880, 887 (9th Cir. 2010) (bankruptcy avoidance action); *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1092 (9th Cir. 2010) (grant of preliminary injunction); *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010) (application of Sentencing Guidelines). We think it useful also for purposes of assessing the district court's challenged decisions here to limit or exclude expert testimony.

**B**

The district court excluded the proffered expert testimony of Dr. Leo for the following reason:

> At the *Daubert* hearing regarding Dr. Leo's testimony, the court learned from Dr. Leo that there was nothing in the record at this point to support his theory that the interrogation techniques used in this case raised the risk of a false confession. . . . Here, the court, as gatekeeper, cannot permit Dr. Leo to testify regarding the possibility of a false confession due to police interrogation techniques when he can point to no evidence in the record that any of these techniques are present in this case.

The district court concluded that "Dr. Leo's opinion regarding Defendant's confession in this case is based solely on conversations Dr. Leo had with defense counsel wherein defense counsel informed Dr. Leo that Defendant had been promised leniency if he confessed."

Both parties dispute the scientific support confirming the phenomenon of false confessions and whether the public generally understands that false confessions may occur even when suspects are not physically assaulted by the police. But the district court did not exclude Dr. Leo on those bases. Rather the district court excluded the evidence after Dr. Leo himself testified that there was nothing in the record to support his theory that the interrogation techniques used in this case raised a risk of a false confession. On review for abuse of discretion, we should not be quick to fault the district court for adopting the position presented by the expert himself.

The district court was correct to require a showing of foundation for the proffered expert testimony. In the course of the *Daubert* hearing, Dr. Leo said that nothing in the record supported his theory of false confession. It was thereafter not unreasonable for the district court to exclude Dr. Leo's proposed expert testimony, particularly where the record affirmatively showed no probability that any technique had been used in interrogation that could support Dr. Leo's theory of a false confession, and where Redlightning's confession followed soon after the start of the polygraph examination questioning. Agent Lauer had said in his report what he recalled, and nothing therein suggested that he had used coercive tactics or promises of leniency. If Redlightning wanted to dispute this, he could have testified himself on that score. *See United States v. Beltran-Gutierrez*, 19 F.3d 1287, 1289 (9th Cir. 1994) ("[W]hen a defendant takes the stand to protect his Fourth Amendment rights at a pretrial suppression hearing, his testimony cannot later be used against him to prove guilt.") (citing *Simmons v. United States*, 390 U.S. 377, 389 (1968)). Moreover, Redlightning had not told Dr. Leo, who

did not interview Redlightning but rather based his opinions on what counsel told him, that any promises or coercive tactics had occurred.

**[12]** The district court identified the correct legal standard for determining the admissibility of expert testimony: Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court's application of the expert-testimony standard was logical, plausible, and supported by inferences that may be drawn from the record. If expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," such testimony is admissible so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The trial judge must perform a gatekeeping function to ensure that the expert's proffered testimony is both reliable and relevant. *See United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007). The gatekeeping function requires that the judge assess whether "the reasoning or methodology underlying the testimony is scientifically valid," and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

**[13]** Here, Redlightning did not sufficiently show how Dr. Leo's testimony would have applied to the facts of his case. Perhaps most importantly, Dr. Leo testified that nothing in the record, including the FBI reports of the October 2 interview and the testimony at the pretrial suppression hearing, showed that any coercive tactic that may lead to a false confession was used when the FBI questioned Redlightning. To be relevant, an expert's opinion must be based on "sufficient facts or data," and the witness must be able to "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Dr. Leo testified that Redlightning's attorneys told Dr. Leo that Redlightning had said that he was given an implied promise of leniency for admitting his guilt, a technique that may lead to a false confession. The district court concluded, however, that, although Federal Rule of Evidence 703 allows an expert to form opinions on the basis of inadmissible evidence, this particular third-party information learned from defense counsel would not support a reasonable opinion on the veracity of Defendant's confession. We agree it could not be reasonable to rest an expert opinion on advice of counsel rather than facts provided by a party or a witness. *See W.R. Grace*, 504 F.3d at 761 (citing Federal Rule of Evidence 703 and holding that although the facts and data relied on by the expert need not be admissible, they must be "reasonably relied upon by experts in the particular field").

**[14]** Dr. Leo himself testified that his expertise is "driven by empirical research" and that "interviewing subjects, if you're a social science [expert], is a form of empirical data gathering." But Dr. Leo never interviewed Redlightning and never indicated his views were based on Redlightning's statements given to Dr. Leo in interview, which would have raised the question whether such an interview was reasonably relied on by experts in Dr. Leo's field. Instead, Dr. Leo relied on statements made to him by counsel, which was not reasonable in these circumstances. Because Dr. Leo did not reasonably point to any evidence in the record or other factors or data reasonably relied on by experts in his field showing that the FBI gave Redlightning an implied promise of leniency in exchange for his confession or used any other coercive interrogation method that may have lead to a false confession, Dr. Leo could not provide any relevant testimony to assist the jury. *See United States v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008) (affirming exclusion of proffered expert testimony on false confessions in part because of limited relevancy because the expert did not examine the defendant and would not testify about the circumstances surrounding his confession). The district court did not err in excluding his testimony.

Redlightning contends that there was sufficient evidence in the record, albeit limited, for the jury to conclude that police techniques that may give rise to a false confession were present in this case. In particular, Agent Lauer, who questioned Redlightning on October 2, had authored training materials teaching law-enforcement officers to use implied promises to extract a confession from a suspect. Although Agent Lauer's FBI reports make no mention of an implied promise given to Redlightning, Redlightning argues on this appeal that the jury could have reasonably concluded that Agent Lauer used an implied promise because his training materials encourage their use. Redlightning also argues that a negative inference should be taken because Agents Powers and Lauer did not seek approval to record their interview of Redlightning.

We conclude that, in the circumstances here, it would have been too speculative to infer from the training materials prepared by Agent Lauer and the decision not to record Redlightning's interview that Agent Lauer in fact used an implied promise that induced a false confession during the October 2 interview. Agent Lauer's reports of the interview, including the polygraph examination, made no mention of an implied promise, and Redlightning did not testify at the *Daubert* hearing contradicting Agent Lauer's report. As noted above, Dr. Leo did not rely on any interview of Redlightning or statement of Redlightning to him. Also, when reviewing for abuse of discretion, it is relevant that Dr. Leo himself did not assert in his testimony at the *Daubert* hearing that these circumstances would have supported his opinion that there was a false confession. That Redlightning admitted to assaulting and killing Disanjh only five questions into the polygraph examination further supports the conclusion that a false confession was not induced.

Under the circumstances of this case, Agent Lauer's training materials coupled with the fact that the examination was not recorded are not sufficient to support a finding by the jury that Agent Lauer in fact made an implied promise of leniency

inducing a false confession. It would be too attenuated to conclude that a particular technique that Agent Lauer included in his training materials must have been used in his interview of Redlightning, and that it necessarily induced a false confession early in the examination.

Moreover, there are reasons beyond the speculative nature of Redlightning's theory as to why there was no abuse of discretion by the district court in denying this expert testimony:

First, the precise theory that Lauer's manual plus failure to record the interview of Redlightning supports an inference that improper techniques were used was not advanced to the district court. At the *Daubert* hearing, Dr. Leo did not explicitly suggest, nor did counsel for Redlightning argue, that the Lauer training manual together with a lack of recording the Redlightning interview was sufficient to infer a foundational basis that promises of leniency were given.[8]

Second, in making its exclusionary ruling, the district court was careful to make this provisional, stating, "The court GRANTS—without prejudice to Defendant's ability to lay a proper foundation for Dr. Leo's testimony—the government's motion to exclude Dr. Leo's testimony." This left open that the evidence could be tendered once more with a more precise explanation on foundation. Redlightning could have preserved

---

[8]At the *Daubert* hearing, Dr. Leo testified that Agent Lauer's training materials included implied promises and that he did not know what occurred during the confession because it was not recorded. Redlightning's attorney argued that because the FBI agents did not record the confession, it was left to the jury to determine how Redlightning confessed. But Redlightning's counsel did not explicitly argue to the district court that it was the combination of the absence of recording and Agent Lauer's training materials that sufficiently laid the foundation for Dr. Leo's testimony. In fact, when redirected to the issue of implied promises, Dr. Leo testified about what Redlightning's attorneys had told Dr. Leo about an implied promise; Dr. Leo did not testify about Agent Lauer's training materials.

for appeal the merits of the court's pretrial exclusionary ruling either by calling Dr. Leo to testify at trial or by otherwise seeking reconsideration of the ruling. We see nothing in the record indicating that Redlightning renewed this claim. That also argues against a conclusion of abuse of discretion. *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 689 (9th Cir. 2001) ("Despite the trial judge's invitation to make an offer of proof at trial, Plaintiffs never did. '[W]here a district court makes a tentative in limine ruling excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial.' "); *Wyller v. Fairchild Hiller Corp.*, 503 F.2d 506, 509 (9th Cir. 1974) ("[W]here evidence offered and objected to has been temporarily excluded, the party who sought to introduce such evidence must renew his effort in that respect at a later, appropriate stage of the trial; his failure to do so precludes him from asserting on appeal that the evidence was erroneously excluded."); *see also Jenkins v. Keating*, 147 F.3d 577, 581 (7th Cir. 1998) (stating that a litigant "may not lull the judge into thinking [an unrenewed motion] has been abandoned and then, after he has lost, pull a rabbit our of his pocket in the form of the forgotten motion.") (internal quotation marks and citations omitted); *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 519 (3d Cir. 1997) (internally quoted in *Tennison* above); *United States v. Holmquist*, 36 F.3d 154, 166 (1st Cir. 1994) ("[W]e conclude that, when a judge issues a provisional *in limine* pretrial order and clearly invites the adversely affected party to offer evidence at sidebar for the purpose of reassessing the scope or effect of the order in the setting of the actual trial, the exclusion of evidence pursuant to that order may be challenged on appeal only if the party unsuccessfully attempts to offer such evidence in accordance with the terms specified in the order."); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 345 (2d Cir. 1994) ("[W]e conclude that appellants abandoned their objection to the exclusion of the testimony by failing to re-offer it to the district court after it was conditionally excluded."); Christopher B. Mueller & Laird C. Kirkpatrick,

1 *Federal Evidence* § 1:16 (3d ed. 2010) ("If the trial judge
. . . indicates that an offer of proof may later be accepted, the
proponent must renew the offer at an appropriate time.").

Third, Redlightning did not testify at the hearing regarding
the admissibility of Dr. Leo's proffered expert testimony, but
could have done so without waiving his privilege against self
incrimination. *See, e.g.*, *Simmons v. United States*, 390 U.S.
at 393-94. Similarly, Redlightning could have given trial testi-
mony recanting his confession, though he was not required to
do so, or he could simply have alerted the FBI if and when
he concluded his confession was a false one.

Fourth, the district court could find Lauer's statements
about his questioning of Redlightning, or Dr. Leo's statement
that he saw nothing in the record supporting the idea of a false
confession, to be plausible. There is no abuse of discretion
under *Hinkson* if the district court's line of reasoning was
plausible.

Fifth, if we adopted Redlightning's theory on appeal, there
is no logical stopping place. If a false confession issue is
foundationally presented in this case permitting the chal-
lenged expert testimony of Dr. Leo, it is hard to see why such
testimony could not come in during almost any murder case
where a confession followed a police interrogation, even
where there was no exculpatory DNA or other physical evi-
dence showing guilt of someone other than the person who
confessed, and no evidence of lengthy or coercive question-
ing. Here, there was a manual of Agent Lauer describing rec-
ommended interrogation techniques. But in other cases,
absent a manual, there would still be instances of how the
police or agents involved had interrogated other persons. If
the manual is probative that Lauer used coercive techniques,
with some promise of leniency in exchange for confession,
contrary to his testimony, that would also be the case with
other police who had not written a manual but who had made
promises of leniency during other unrelated interrogations.

Perhaps this could be avoided if all interrogations leading to confession were recorded, but the Supreme Court has never so required, and we decline to require recording of interrogation as a necessary means to avoid testimony about possibly false confessions.

We do not go so far as to say expert evidence about false confessions can only be offered in a case where a defendant has recanted a confession. There may well be cases where absent a recanted confession, there is still an ample foundation for false confession expert testimony, as, for example, if there is physical evidence that the perpetrator of the crime was someone other than the confessor, or if the nature of the interrogation leading to confession is such that it likely could induce a false confession. However, it is unsound as a general matter to permit such expert testimony in every case of a confession of a murder, even where there is no evidence like DNA suggesting another culprit, and no evidence of any interrogation technique used that is likely to extract a false confession, and where, as here, the confession came very close to the start of the interview.

**[15]** Under these circumstances, where Dr. Leo himself testified that nothing in the record supported his opinion and Agent Lauer testified that he had not used any coercive technique, there was no abuse of discretion in excluding expert testimony of Dr. Leo. We hold that the district court did not abuse its discretion in determining that there was no reliable evidence in the record to support a theory of expert testimony that the interrogation techniques used raised the risk of a false confession.

### C

Redlightning also challenges the district court's decision to limit the testimony of Dr. Breen, a neuropsychologist. The government objected to five areas of possible testimony by Dr. Breen:

1.  Any opinion which extrapolates from the defendant's baseline psychological and mental status, to reach a conclusion on the effects of the interview procedures on October 2 and 3, 2007 on that status.

2.  Any opinion that the defendant is particularly susceptible to providing false or untrue information in a police interview setting.

3.  Any opinion on the connection between the defendant's PTSD and his cognitive function, stress or anxiety level on October 2 and 3, 2007.

4.  Any opinion on the connection between the defendant's vision problems and his cognitive function, stress or anxiety level on October 2 and 3, 2007.

5.  Any opinion on the connection between the defendant's diabetes and his cognitive function, stress or anxiety level on October 2 and 3, 2007.

The district court excluded Dr. Breen's testimony regarding all areas except for area 3, which involved PTSD. With respect to areas 4 (vision problem) and 5 (diabetes), the court concluded that Dr. Breen "is not qualified as an expert in these areas." With respect to areas 1 (effect of interviews) and 2 (susceptibility falsely to confess), the district court concluded that it was not satisfied that "anything about Dr. Breen's [expertise] qualifies him to opine as to Defendant's susceptibility to giving a false confession during the police interrogation on October 2 and 3, 2007." But the district court allowed Dr. Breen to testify about Redlightning's mental condition on those dates and discuss how his mental condition may affect the weight the jury would give to the confession. As for PTSD, the district court permitted Dr. Breen to testify about Redlightning's PTSD and his cognitive function, stress,

and anxiety level on those dates but prohibited him from "opin[ing] as to whether Defendant's PTSD made him susceptible to a false confession."

**[16]** We conclude that the district court did not abuse its discretion in determining that Dr. Breen was not qualified to testify about the physical, medical symptoms of hypoglycemia and whether Redlightning may have falsely confessed because of his PTSD. Dr. Breen's proffer implied that he would testify about the physical medical symptoms of hypoglycemia, not the psychological symptoms. It was logical for the district court to conclude that Dr. Breen, who was not a physician, was not qualified to testify about the physical symptoms of hypoglycemia. Similarly, Dr. Breen's expertise included analysis of Redlightning's "mental condition" but did not extend to whether Redlightning was susceptible to giving a false confession during a police interrogation. Notably, Dr. Leo testified that he was unaware of any research linking PTSD with false confessions. The district court did not abuse its discretion in excluding this expert testimony because it was logical to conclude that Dr. Breen was not qualified to testify about the effects of a police interrogation but was qualified to testify about Redlightning's mental condition due to his PTSD.

It was also argued that the district court abused its discretion by limiting Dr. Breen's testimony regarding how the absence of diabetes medicine and medical equipment may have affected Redlightning's anxiety and how the absence of Redlightning's eyeglasses may have increased Redlightning's stress. The district court's decision states that Dr. Breen was not an expert in the field of diabetes or in the area of vision impairment. The government contends that there was no scientific basis for Dr. Breen's testimony regarding the psychological effects of the absence of Redlightning's diabetes medicine and medical equipment as well as the absence of his eyeglasses. But the district court did not exclude Dr. Breen's testimony because of the dearth of scientific evidence; the dis-

trict court excluded the testimony because Dr. Breen was not "qualified as an expert in these areas." The district court had earlier stated that "Dr. Breen may testify to the Defendant's mental condition on October 2 and 3, 2007, and how that may affect the weight to be given to the confession." Redlightning argues that Dr. Breen's proferred testimony on the subjects of the diabetes medicine and absence of eyeglasses was inherently focused on Redlightning's mental condition. Thus, the argument runs, the district court's decision to exclude this testimony was illogical and an abuse of discretion. *See Hinkson*, 585 F.3d at 1262.

**[17]** It is rather difficult for Redlightning to show error by the district court in this respect when Dr. Breen did not appear at his *Daubert* hearing and so did not present his expertise. But even if the district court erred, by the limiting of Dr. Breen's testimony, any error was harmless. An ophthalmologist described Redlightning's visual impairments and provided a demonstrative aid showing the limitations of Redlightning's vision. Further, another psychiatrist testified that Redlightning's diabetes could affect his cognitive functioning, rendering Dr. Breen's testimony on the subject redundant. Dr. Breen was himself able to testify extensively about Redlightning's neuropsychological limitations and his PTSD. Dr. Breen testified, for example, that when Redlightning's PTSD was "in the ascendency," his "ability to process information both on a factual basic cognitive basis and on the metacognitive basis would be compromised." Dr. Breen's further testimony was unnecessary for the jury to infer that because Redlightning suffered from PTSD, had limited cognitive functions, and did not have his medicine or eyeglasses, his confession was less reliable. These points were amply before the jury. We conclude that it was more probable than not that any error regarding Dr. Breen's testimony did not materially affect the verdict. *See United States v. Cohen*, 510 F.3d 1114, 1127 (9th Cir. 2007).

## V

Redlightning further argues that the district court erred in excluding: (1) evidence that in 1987 a detective investigating the Disanjh murder told one-time suspect John Root a fact that was unknown to him, namely, that Disanjh had been strangled; (2) hearsay evidence that a woman reported in 1989 that her boyfriend killed a person fitting Disanjh's description; and (3) evidence of the number of manual strangulations that occurred in neighboring King County. We review a district court's rulings on the relevance of evidence for abuse of discretion, *United States v. Tatoyan*, 474 F.3d 1174, 1178 (9th Cir. 2007). Again, we think that application of the standard from *Hinkson* is useful, and we conclude that the district court did not abuse its discretion in excluding this evidence.

## A

**[18]** The parties agree that a key element of Redlightning's defense was arguing that his confession was unreliable. Had Redlightning been able to show that Agent Lauer fed Redlightning information about the crime that Redlightning, if innocent, would not otherwise have known, such evidence may have undermined the reliability of Redightning's confession. Consistent with this defense theory, Redlightning sought to admit evidence that a different detective investigating the Disanjh murder in 1987 fed information to then-suspect John Root that Root, if innocent, would not otherwise have known. If one detective investigating the murder was willing to pass nonpublic information to a suspect, Redlightning contends that another investigator may have been willing to do the same. The district court excluded the evidence of the 1987 interview as irrelevant to what occurred in 2007. Redlightning's theory was too speculative and attenuated.

It was logical for the district court to conclude that what occurred during an interview separated by nearly twenty years and involving different detectives, different law-enforcement

agencies, and a different suspect was not probative of what happened during the 2007 questioning. Redlightning argues that the district court improperly excluded the evidence on the basis of the court's personal beliefs—that is, the court said that it did not think the facts of the first interview were "particularly helpful for the jury." But this was not error, because the district court is correct in saying that an irrelevant fact is not helpful to a jury. The district court explained that it was "not convinced that the investigating techniques of the Whatcom County Sheriff in 1987 relate to the 2007 FBI investigative techniques." We agree. This evidence was not relevant. The district court did not abuse its discretion.

**B**

In 1989, Cheryl Lunde, initially as an anonymous tip, reported to the police that she had seen her boyfriend, Harold Jones, manually strangle and kill "the blonde female found in the river last year." Lunde identified the time of the murder as August 1987, the month in which Disanjh was killed. Lunde's physical description of the victim generally matched Disanjh. Lunde claimed that Jones threatened the victim with a piece of rope and strangled the victim with his hands. Rope was discovered at the Disanjh crime scene. Thus, there were some parallels. However, Lunde said that victim snorted cocaine just before she was killed, and blood samples taken from Disanjh showed no signs of drug use. Lunde also twice recanted her statement, explaining that she was drunk at the time she made it, was angry at her boyfriend, and wanted to get her boyfriend in trouble. The police investigated Lunde's tip but could not corroborate it.

Because Lunde died before Redlightning's trial, Redlightning attempted to admit Lunde's statement naming Jones as the killer through the testimony of the investigating detectives. Redlightning submitted that the testimony was admissible either under Federal Rule of Evidence 807, the residual

hearsay rule, or simply on constitutional grounds. We disagree.

**[19]** The district court did not abuse its discretion in excluding the hearsay evidence. First, *Crane v. Kentucky*, 476 U.S. 683 (1986), the basis for Redlightning's constitutional argument, did not overrule the concepts embedded in the Federal Rules of Evidence, *id.* at 690. In *Crane*, the Supreme Court stated,

> That opportunity [to be heard in defense] would be an empty one if the State were permitted to exclude *competent, reliable evidence* bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.

*Id.* at 690-91 (internal quotation marks omitted, emphases added). Here the district court logically concluded that the evidence was not competent or reliable. Similarly, the district court did not err in excluding the evidence under the residual hearsay exception. Under this exception, hearsay that is not otherwise admissible may still be admissible if it has "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807; *United States v. Shryock*, 342 F.3d 948, 982 (9th Cir. 2003). The district court concluded that there were no such guarantees of trustworthiness because the information Lunde provided was publicly available, Lunde twice recanted her statement, and Lunde had motive to lie to get her boyfriend in trouble. Other factors suggest that Lunde's statement was unreliable, including that Lunde's statement was unsworn, that the police did not corroborate the details of the statement, and that no drugs were detected in the victim's body even though Lunde said that the victim had used cocaine

shortly before the murder. The district court did not abuse its discretion in excluding this hearsay evidence.

## C

[20] Disanjh died of manual strangulation, and the Whatcom County pathologist testified that the Disanjh murder was the only case of manual strangulation he had observed in his thirty-six years of practice in Whatcom County. Thus that prosecution testimony may have implied that Redlightning committed a signature crime when strangling Disanjh. To counter that, Redlightning sought to admit the testimony of the King County medical examiner, who would have testified that out of the 2,600 autopsies he performed in his twenty-six years of practice in King County, "approximately 100 of those involved manual strangulation." The district court excluded the King County statistical evidence because, "under [Federal Rule of Evidence] 401, I do not believe that this evidence is relevant."

The district court did not abuse its discretion in so ruling. The district court explained that Whatcom County and King County (which contains the city of Seattle) are similar only to the extent "that one is an hour and a half drive by freeway away." The district court logically explained that King County, unlike Whatcom County, is "highly urbanized," and it was unclear "how the rural areas in each of those two counties would compare." The district court logically concluded that it had no information regarding any "patterns in regards to strangulations that they occur more often by type of victim." Furthermore, Redlightning was able to present to the jury evidence from the Washington Attorney General showing that manual strangulation occurred in six out of the seventy murders reported in Whatcom County between 1987 and 2007. This estimate of the percentage of manual strangulations in Whatcom County (8.57 percent) is even higher than the percentage of manual strangulations that the King County medical examiner would have described (3.85 percent).

Accordingly, any error in admitting the testimony of the King County medical examiner was harmless. *See United States v. Edwards*, 235 F.3d 1173, 1178-79 (9th Cir. 2000).

We conclude that the district court did not abuse its discretion in excluding (1) evidence that in 1987 a different detective investigating the Disanjh murder told one-time suspect John Root a fact unknown to the public; (2) unreliable hearsay evidence that a woman reported in 1989 that her boyfriend killed a woman roughly fitting Disanjh's description; and (3) evidence of the number of manual strangulations that occurred in urbanized King County.

## VI

Redlightning also challenges the district court's decision to admit evidence that he previously confessed to committing another sexual assault, of which Redlightning was later convicted after pleading guilty. Redlightning contends that the evidence was not relevant and that its admission was improper under Federal Rules of Evidence 404(b) and 413. In particular, Redlightning argues that the 1990 confession was inadmissible if used to show that he had the propensity to truthfully confess. As we stated earlier, we review for abuse of discretion a district court's ruling regarding the relevance of evidence, *Tatoyan*, 474 F.3d at 1178. But we review de novo the district court's interpretation of the Federal Rules of Evidence, including whether a particular piece of evidence falls within the scope of the given rule. *United States v. Garrido*, 596 F.3d 613, 616 (9th Cir. 2010).

The government sought to admit evidence that Redlightning committed a sexual assault against Linda Rosario in 1990. Redlightning and Rosario had been drinking in a tavern where they spoke for thirty minutes discussing Redlightning's experience in Vietnam, triggering Redlightning's PTSD. After Rosario left the tavern, Redlightning tackled Rosario in an alley. Redlightning choked and beat Rosario, forced her to

perform oral sex, ripped off her clothes, and penetrated her vagina with his fist. Redlightning told Rosario she "wasn't the first or [she] wouldn't be the last." Redlightning choked Rosario into unconsciousness with her bra. Some forty-five minutes later, Redlightning returned to the alley and asked Rosario who had assaulted her. Redlightning took Rosario into a restaurant where Rosario contacted the police. Redlightning later told a police officer that he was responsible for the assault. The officer advised Redlightning of his *Miranda* rights and took Redlightning to the police station. At the station, the officers again told Redlightning of his *Miranda* rights. Redlightning admitted assaulting and choking Rosario but at first denied having sexual intercourse with her. Later Redlightning admitted to choking and sexually assaulting Rosario. Redlightning pleaded guilty to first-degree rape and second-degree assault.

**[21]** Although propensity evidence generally is inadmissible under Federal Rule of Evidence 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith . . . ."), Federal Rule of Evidence 413 provides an exception for admission of propensity evidence when it involves the commission of another sexual assault. Subject to the limitations of Federal Rule of Evidence 403,[9] a party may admit evidence of a sexual assault in order to prove that the defendant has the propensity to commit another sexual assault. *Cf. United States v. Sioux*, 362 F.3d 1241, 1244 (9th Cir. 2004). In its effort to show that Redlightning committed the 1990 Rosario assault, the government sought to admit, and the district court allowed the jury to hear, evidence that Redlightning confessed to that crime.

---

[9]Before admitting evidence of a prior sexual assault, the district court must consider the Rule 403 factors, such as the possibility of unfair prejudice or confusion of issues. *United States v. LeMay*, 260 F.3d 1018, 1027-28 (9th Cir. 2001). The district court engaged in that analysis and Redlightning does not challenge the Rule 403 analysis on appeal.

**[22]** The introduction to the jury of Redlightning's 1990 confession was not error. Under Rule 413, the government may admit "evidence of the defendant's commission of another offense or offenses of sexual assault." Evidence that tends to show that Redlightning committed another sexual assault, namely, his 1990 confession to that sexual assault, was admissible under Rule 413 because it tends to show that Redlightning had the propensity to commit another sexual assault, namely, the Disanjh offense. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000) (observing that Rule 414, evidence of similar crimes of child molestation, like its companion Rule 413, "was passed to make an exception to Fed. R. Evid. 404(b), which imposed a blanket prohibition on propensity evidence"). There are many ways to prove at trial that a defendant committed a different sexual assault, including admission of the judgment of conviction or presenting the testimony of the victim. A different way to prove that the defendant committed another sexual assault is through the defendant's own admission, as occurred here. *See United States v. LeMay*, 260 F.3d 1018, 1029 (9th Cir. 2001) (affirming district court's ruling admitting evidence of defendant's confession to a prior act of child molestation under Rule 414). That Redlightning confessed to sexually assaulting Rosario showed that he had committed another sexual assault and therefore had the propensity to so offend again. Admission of Redlightning's 1990 confession for this purpose was permitted by the Federal Rules of Evidence.

**[23]** Similarly, evidence surrounding Redlightning's 1990 confession was admissible for noncharacter, nonpropensity purposes. For example, the fact that Redlightning had previously interacted with police officers and answered their questions tends to show that Redlightning had experience with the police and would not be surprised, overpowered, or overwhelmed by their presence or tactics in 2007. Similarly, the fact that the police previously gave Redlightning a *Miranda* warning and that Redlightning waived his *Miranda* rights in

1990 tends to show that Redlightning understood those rights when given again in 2007. This evidence about the Rosario assault made it less likely that Redlightning's mental condition rendered his 2007 confessions incredible.

**[24]** Nonetheless, to the extent that the jury was allowed to infer from Redlightning's 1990 confession that he had the propensity to truthfully confess, the district court erred in admitting the evidence. The special rule permits evidence of propensity to commit a sexual offense, not propensity to confess. With the exception of propensity to recommit a sexual offense discussed above, the Federal Rules of Evidence prohibit "other acts"[10] evidence for the purpose of showing action in conformity therewith. Fed. R. Evid. 404(b). This general prohibition includes evidence used to show that a defendant has the character for honesty or for truthfully confessing. *See United States v. Hedgcorth*, 873 F.2d 1307, 1313 (9th Cir. 1989) (discussing defendant's "character for truthfulness"); Fed. R. Evid. 406 advisory committee note (including "honesty" in description of a character trait). To the extent the jury could improperly infer from Redlightning's 1990 confession that he had the character and propensity truthfully to confess, admission of the 1990 confession for this purpose was improper.

**[25]** However, we review for plain error the admission of the 1990 confession, because Redlightning did not request an instruction expressly limiting the introduction of the 1990

---

[10]Although courts typically refer to the "other acts" component of Rule 404(b) as "previous bad acts," the rule is not limited to "bad" conduct. *United States v. Curtin*, 489 F.3d 935, 943 n.3 (9th Cir. 2007) (en banc) ("The 'acts' described need not be 'bad' acts, even though 'bad' is the improper adjective sometimes misused to describe them. Rule 404(b) covers not just other crimes or wrongs, but also explicitly 'other acts'—if the 'other' acts are relevant to the purposes specified in the rule such as intent, motive, preparation, knowledge, etc. The other 'act' does not need to be 'bad,' just relevant in such a way as to avoid being nothing more than character or propensity evidence." (citation omitted)).

confession for the purposes allowed. The instruction that Redlightning requested and that the district court gave to the jury adopted the language of Rule 413—"[E]vidence of the defendant's commission of another offense of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." Because Redlightning did not request a limiting instruction precluding consideration of a propensity truthfully to confess, our review on that issue is limited to plain error. *See United States v. Sauza-Martinez*, 217 F.3d 754, 759 (9th Cir. 2000) (holding that where a defendant did not request a jury instruction necessary to limit admitted hearsay testimony, even when the government stated that it would ask for a limiting instruction but failed to do so, the review is limited to plain error); *United States v. Multi-Management, Inc.*, 743 F.2d 1359, 1364 (9th Cir. 1984) ("It is well-settled that where no limiting instruction is requested concerning evidence of other criminal acts, the failure of the trial court to give such an instruction *sua sponte* is not reversible error."). Under the plain-error doctrine, the court is to correct "only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Young*, 470 U.S. 1, 15 (1985) (citation and internal quotation marks omitted).

**[26]** We conclude that admission of the 1990 confession was not plain error. The jury was allowed to hear about the circumstances of Redlightning's interaction with the police in 1990 (including that Redlightning had been read and waived his *Miranda* rights). The jury was also allowed to hear, under Rule 413, that Redlightning in fact confessed to the 1990 sexual assault. Thus, any error in allowing the jury to infer a propensity to confess truthfully was not plain error, and was at most harmless error, because the court could have admitted the 1990 confession for proper purposes. *See United States v. Cherer*, 513 F.3d 1150, 1158 (9th Cir. 2008) ("Thus, even were we to find that the court erred by admitting the AOL complaints to prove Cherer's intent or plan, the error would be harmless because the court could have properly admitted

the complaints to prove identity."); *United States v. Mehr-manesh*, 689 F.2d 822, 831 n.10 (9th Cir. 1982) (harmless error where evidence was admissible for another purpose); *see also United States v. Marin*, 523 F.3d 24, 31 (1st Cir. 2008) (holding that there was no plain error even where the government relied improperly on certain admitted evidence because the evidence was admissible for another purpose). Because Redlightning's confession was properly admitted for one purpose and the jury received a proper instruction regarding that purpose, we cannot say that it was plain error for the jury to hear that evidence without being instructed that it could not use it for another purpose.

## VII

Redlightning also challenges the district court's decision to deny his proposed jury instruction regarding the reliability, credibility, and truthfulness of his confession. Redlightning objected to the following instruction, which the jury heard and which is the Ninth Circuit Model Criminal Jury Instruction 4.1 (2000):

> You have heard testimony that the defendant made a statement. It is for you to decide (1) whether the defendant made the statement, and (2) if so, how much weight to give to it. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the defendant may have made it.

**[27]** Redlightning proposed changing the final sentence to read: "In determining how much weight to give the statement, it is your responsibility to determine if the statement is voluntary and to further determine whether the statement is credible, truthful and reliable." We review for abuse of discretion a district court's formulation of a jury instruction. *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009). To the extent the instruction is an incomplete and therefore incor-

rect statement of law, we review the instruction de novo. *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010). We conclude that the district court did not err in denying Redlightning's proposed jury instruction.

Redlightning argues that under *Crane v. Kentucky*, 476 U.S. 683 (1986), the jury must assess the reliability, truthfulness, and credibility of a confession. According to Redlightning, the model jury instruction did not properly charge the jury with making those determinations because it used the term "weight." Redlightning submits that even if the term "weight" would encompass whether a confession was credible, truthful, and reliable, a lay jury would not fully understand its responsibilities when instructed with that term. Redlightning further contends that the jury may have misunderstood the term "weight" to mean "sufficiency."

**[28]** There is more than one path to a mountaintop. There is more than one way to instruct a jury on law with a set scope, conveying it fairly. "[T]he relevant inquiry is whether the instructions *as a whole* are misleading or inadequate to guide the jury's deliberation." *United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009). *Crane* does not require particular instructions regarding the jury's assessment of a confession; it holds only that after the district court determines that a confession is voluntary, the jury may assess its credibility. 476 U.S. at 687-90. Here, the model jury instruction was an accurate statement of law. It directed the jury to assign to the confession the weight the jury believed appropriate given "all of the evidence" and "the circumstances under which [Redlightning] may have made it." The evidence and the circumstances here would include the method the FBI agents used to elicit the statements, the accuracy or inaccuracy of the statements, and Redlightning's physical and mental condition. The jury instruction was an accurate statement of law, and the district court's decision to use the model instruction over Redlightning's proposed instruction was not illogical, implau-

sible, or without support in the record.[11] *See Hinkson*, 585 F.3d at 1262.

## VIII

Redlightning's final contention is that the prosecutor engaged in unconstitutional misconduct by arguing to the jury during rebuttal closing argument the following:

> This gets us to the main theme of the case, and that is that *people don't confess to things they didn't do*. Not when they're faced with prosecution and time in prison. Not when they know they can be punished, and they don't confess with the details. Details that can be corroborated by physical evidence and by witness testimony.

> . . . .

> The reasonable doubt instruction that you'll receive tells you that a reasonable doubt is one based on common sense and reason. Not purely speculation. *Common sense tells you that people don't confess to crimes they didn't commit*.

Redlightning contends that these statements, when combined with the government's pretrial position that jurors would be familiar with the concept of false confessions, the exclusion of Dr. Leo's testimony, and the known phenomenon of false confessions, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Redlightning also contends that the argument was plain error because the government knew that it was factually untrue and unsupported by the evidence. Because Redlightning did not object to the argument at trial, we review for plain error. *See*

---

[11]We have previously approved the same model instruction. *United States v. Hoac*, 990 F.2d 1099, 1108 n.4 (9th Cir. 1993).

*United States v. Sullivan*, 522 F.3d 967, 982 (9th Cir. 2008) (per curiam). We conclude that there was no plain error in the closing argument. *See id.* ("When prosecutorial misconduct is alleged, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." (internal quotation marks omitted)).

**[29]** The prosecutor's arguments were not improper. "Prosecutors have considerable leeway to strike hard blows based on the evidence and all reasonable inferences from the evidence." *Id.* (internal quotation marks omitted). Arguing that a person would not confess to a crime unless that person committed the crime is a fair inference to be drawn from common sense, and the argument is not misconduct because it is generally true, particularly where the person faces prosecution and extended imprisonment. While empirical evidence has shown that at times innocent people have confessed to crimes that they did not commit, a prosecutor should not be prevented from arguing in closing remarks that common sense tells us that people do not confess to crimes they did not commit.

To the extent that the prosecutor omitted a qualifier such as "most people" or "the vast the majority of people" or "only but the slightest few people" before arguing that people do not confess to crimes they did not commit, such an omission did not affect the fairness, integrity, or public reputation of the judicial proceedings. The prosecutor was providing argument, not evidence, and Redlightning had the opportunity during his closing argument to stress the absence of the taped interrogation and Redlightning's physical and mental condition to undermine the prosecution's position that Redlightning's confession was credible, truthful, and reliable.

## IX

We conclude that the district court did not err in (1) refusing to suppress Redlightning's confessions; (2) excluding cer-

tain portions of expert testimony regarding the effects of hypoglycemia and PTSD on a confession; (3) excluding Dr. Leo's testimony regarding false confessions; (4) excluding evidence that a police officer previously supplied a suspect with nonpublic information about the murder, excluding unreliable hearsay evidence pursuant to the residual hearsay exception that another suspect may have committed the murder, and excluding evidence of manual strangulations in neighboring King County; and (5) rejecting Redlightning's proposed jury instruction regarding the credibility, reliability, and truthfulness of his confessions. We also conclude that the prosecutor's closing argument did not result in plain error. If and to the extent the district court erred in excluding Dr. Breen's testimony about the absence of Redlightning's medicine, medical equipment, and eyeglasses, that error was harmless in light of other evidence admitted. And although the district court did not limit the jury's use of Redlightning's 1990 confession under Rule 413, the absence of a limiting jury instruction, which Redlightning did not request, did not constitute plain error.

**AFFIRMED.**